**DOW CHEMICAL COMPANY, Plaintiff/Cross–Appellant,**

v.

**The UNITED STATES, Defendant– Appellant.**

Nos. 97–5035, 97–5038.

United States Court of Appeals, Federal Circuit.

Sept. 6, 2000.

Arthur M. Lieberman, Lieberman & Nowak, LLP, of New York, New York, argued for plaintiff cross-appellant. Of counsel was Kevin S. Rhoades.

Grace Stewart Karaffa, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were Vito J. DiPietro, Director; Thomas J. Byrnes, Assistant Director; and B. Frederick Buchan, Jr., Attorney.

Before RICH, Circuit Judge,[*]
ARCHER, Senior Circuit Judge,[**] and
GAJARSA, Circuit Judge.

ARCHER, Senior Circuit Judge.

## DECISION

The United States appeals the judgment of the United States Court of Federal Claims in favor of Dow Chemical Company (Dow) holding the United States liable for damages for patent infringement. Dow cross-appeals the amount of damages awarded. We affirm-in-part, reverse-in-part, vacate-in-part, and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

I. For many years the United States Bureau of Mines (government) sought solutions to the problem of subsidence of the land overlying depleted mines. In the early 1970s Dow developed an improved method for filling abandoned mines in order to prevent the collapse of the overlying land.

In 1972, the government and Dow entered into a contract for subsidence control work at Scranton, Pennsylvania using the improved method. Under part of the contract, the government was licensed to use this invention as disclosed in U.S. Patent Application Serial No. 86,755 and any patents issuing thereon, including the patent-in-suit, U.S. Patent No. 3,817,039 (the '039 patent). The terms of the license provided for (i) a royalty-free right to use the invention for government purposes on federal lands only; (ii) a royalty-free right to use the invention for government purposes to cover up to 2.5 million cubic feet of mine filling material on other than federal land;

---

[*] Circuit Judge Rich died on June 9, 1999. This case was decided by the remaining judges in accordance with Fed. Cir. Rule 47.11.

[**] Senior Circuit Judge Archer vacated the position of Chief Judge on December 24, 1997.

and (iii) thereafter, to use the invention at a royalty rate that would not exceed 25% of a reasonable commercial rate to be agreed upon by the parties. After Dow completed the Scranton project, the government undertook an extensive program of mine backfilling projects using other contractors.

By letter dated July 9, 1975, Dow requested an accounting from the government for royalties due under the license. It also proposed a royalty rate to the government of 2% (25% of a reasonable commercial royalty) of the contract price for any particular project where the invention was used. During the remainder of 1975 and 1976, the parties undertook negotiations concerning the reasonable commercial royalty to be applied.[1]

On December 28, 1976, the government informed Dow that it had not practiced the invention covered by the '039 patent and, for this reason, no royalty payments were due. Dow requested that the government reconsider its position, and over the next two years the government investigated the claim.

On November 2, 1978, the government informed Dow that it had reconsidered its position expressed in the December 28, 1976 letter and that new information raised "seriously litigable issues" as to validity and infringement, and viability of the license. The letter affirmed that no royalty payments would be made and concluded this was the government's "final decision," and that "[n]o action will be taken on any further requests for reconsideration of this matter."

Dow filed for a reissue of the '039 patent in February 1980, which the government opposed. At the conclusion of the proceedings, all allegations of invalidity were overcome and the original claims remained intact. Based on these events, Dow requested that the government reconsider its refusal to pay royalties. The government advised Dow in December 1982 that it saw "no reason to change its position."

In January 1983, Dow commenced suit seeking a reasonable royalty for the government's infringement of the '039 patent. In the alternative, Dow sought damages for the government's breach of the license. By letter dated January 10, 1985, Dow notified the government that it was terminating the license, effective as of the date of the breach of the contract or the date of the notice, whichever was legally earlier, because the government had failed to pay royalties.

II. The Court of Federal Claims issued a series of opinions. First it held that the '039 patent was not invalid and was infringed by the government.[2] Thereafter, the court held that the government's non-payment of royalties and repudiation of the license constituted a material breach that warranted voiding the contract *ab initio*. For this reason damages were awarded on the basis of unlicensed infringement, instead of breach of contract.[3] The court also concluded that Dow's infringement claim was not barred by the six year statute of limitations in 28 U.S.C. § 2501 due to the application of the tolling provisions of 35 U.S.C. § 286.[4] Finally, the court determined that the damages to Dow should be based on the value of the property saved (benefit conferred) rather than on the cost of projects using the invention.[5]

---

1. In late 1975, Dow offered to adjust the royalty rate it had initially proposed, and in January 1976, the government requested a meeting to resolve the royalty matter and to clarify the scope of claims 1–3 of the '039 patent.

2. *See Dow Chem. Co. v. United States,* 20 Cl.Ct. 623, 18 USPQ2d 1657 (1990) (trial to the court) *(Dow I )*.

3. *See Dow Chem. Co. v. United States,* No. 19–83C (Cl.Ct. Nov. 9, 1992) (Order); *Dow*

*Chemical Co. v. United States,* 32 Fed.Cl. 11 (1994) (issues resolved on summary judgment) *(Dow II )*.

4. *See Dow II,* 32 Fed.Cl. 11 (1994).

5. *See Dow Chem. Co. v. United States,* 36 Fed. Cl. 15 (1996) (trial to the court) *(Dow III )*. The court found that Dow was entitled to a 15% royalty on the value of the benefit con-

The government now appeals the Court of Federal Claim's judgment as to validity[6] and infringement of the patent. It also appeals the court's judgment that the license was void *ab initio*, and the court's methodology for assessing damages. Dow cross-appeals the amount of the court's damage award. We have jurisdiction to hear the appeal under 28 U.S.C. § 1295(a)(4)(A) (1994).

### DISCUSSION

#### I. *Infringement*

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device [or process] accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976, 34 USPQ2d 1321, 1326 (Fed.Cir.1995) (*en banc*), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). The first step, claim construction, is a question of law which we review *de novo*. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed.Cir.1998) (*en banc*). Although we review claim construction *de novo*, "we ... begin with and carefully consider the trial court's work." *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 713, 48 USPQ2d 1911, 1914 (Fed.Cir.1999) (citing *Cybor*, 138 F.3d at 1462–63, 46 USPQ2d at 1179–81 (Plager and Bryson, JJ., concurring separately)). The second step is a factual determination. *See North Am. Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1574, 28 USPQ2d 1333, 1335 (Fed. Cir.1993).

#### A. Claim Construction

1. The government contends that the Court of Federal Claims erred in construing claims 1, 2 and 3 of the '039 patent, which the court found to be infringed. These claims read as follows:

1. In the method of emplacing a layer of solid particles in a subterranean void wherein the layer occupies at least a major portion of the height of said void, comprising injecting a mixture of a carrier liquid and particulate solids through a conduit connecting a work surface and said void, the improvement which comprises:

 a. providing a closed system between injection equipment for said mixture, said conduit and said void;

 b. providing a suspension of said carrier liquid and said solids; and

 c. injecting said suspension into said void through said conduit at an injection rate which is sufficiently low such that initially upon entrance into said void from said conduit the velocity of the suspension is below its minimum linear velocity and at least a portion of said solid particles are deposited to form a mound which decreases the cross-sectional area of said void, and sufficiently high to propel the suspension over said mound at a velocity at least equal to its minimum linear velocity to carry particles over said mound whereby they are deposited to increase the length and height thereof, to form a layer of solid particles in said void.

2. The improved method as defined in claim 1 wherein the height of the void is substantially completely filled with said particulate solids.

3. The improved method as defined in claim 1 wherein said conduit comprises a substantially vertical bore-

---

ferred, or $17,325,000. *See id.* at 26. Delay compensation was added for a total award of $86,817,461. *See Dow Chem. Co. v. United States*, No. 19–83 (Ct.Fed.Cl. Oct. 28, 1996).

6. The government has not appealed the validity holding, as such, but contends in its infringement arguments that if the Court of Federal Claims' broad claim interpretation is correct, the asserted patent claims are invalid.

hole connecting the void with a work surface.

'039 patent, col. 7, ll. 7–33, col. 8, ll. 1–4.

Specifically, the government argues that the court, by considering and relying upon expert testimony as to the meaning of step (c) of claim 1, read out of the claim the functional limitation created by the term "injection rate" in step (c). The government argues that the claims, specification, and prosecution history make clear that the injection rate referenced in step (c) was deemed critical to the process and that this rate is at least roughly defined by the formula, V=XdDv, which is set out in the specification and in dependent claim 4.[7] According to the government, the court's construction of claim 1 is too broad and it encompasses injection rates much lower than those contemplated by the patent. The government also argues that the court's broad construction would make the claims invalid over prior art.

Dow argues that claim 1 is not limited by the formula, and that the formula in claim 4 cannot be read into claim 1. It contends that the patent describes a way to determine the injection rate other than by the formula. Dow also argues that the government's invalidity contention is not correct.

The Court of Federal Claims stated that claim 1 "sets out the three elements of the invention: a closed system, a suspension, and mound formation." *Dow I*, 20 Cl.Ct. at 639. Further, the court stated that "the other requirement of the patent in addition to the 'closed system' of step (a) and the 'suspension' of step (b) is that of mound formation under claim one, step (c)...." *Id.* at 644. The court determined that "[t]he majority of the testimony and evidence concerning step (c) indicates that once the other parameters of the invention are met, mound formation is inevitable," and concluded that "what happened in the void was not controllable." *Id.* In further support of its conclusion, the court stated:

> Once a slurry is injected into the void at MLV[8] or above through a closed pressurized system no more can be done. Step (c) of claim one describes what happens in the void and is part of the patent, but it is not a physical act within the control of anyone once steps (a) and (b) have been accomplished.

*Id.* The court held that "steps (a) through (c) of claim one require use of a closed pressurized system and a suspension, as previously defined." *Id.* Thus, the court construed step (c) of claim 1 simply to describe the desired result of steps (a) and (b), *i.e.*, mound formation.

■ 2. The court's conclusion, however, is at odds with the language of claim 1, step (c), the written description of the invention in the patent specification, and the prosecution history of the '039 patent, all of which indicate that mound formation is controllable, and is achieved through the injection of the suspension into the void at a certain critical (minimum) rate. Step (c) of claim 1 is part of the invention claimed. It specifically requires "injecting said suspension into said void through said conduit *at an injection rate* ...." '039 patent, col. 7, ll. 19–20 (emphasis added). According to the claim language, this injection rate must be such that initially upon entrance into the void to be filled the velocity of the suspension falls below MLV, which per-

---

7. Claim 4 of the '039 patent reads as follows:
 4. The improved method as defined in claim 3 wherein the suspension is injected through the borehole at a minimum rate calculated by the formula V=XdDv wherein V is the rate of injection in cubic feet per minute. X is a number of 3 or greater. d is the diameter in feet of the largest solid particles in said suspension. D is the diameter of the base of a cone formed by said particles in said carrier liquid when motionless, said cone having a height equal to the height to which said void is to be filled with said particles and v is the minimum linear velocity of said suspension.

8. MLV is the "minimum linear velocity to transport solids hydraulically," *Dow I*, 20 Cl. Ct. at 637, *i.e.*, in a slurry. MLV is not, however, the injection rate called for by the patent, but merely a factor in determining the injection rate. *See, e.g.*, the formula in claim 4, *supra*, note 7.

mits some solid particles to be deposited to form a mound that decreases the cross-sectional area of the void. But the injection rate must be sufficiently high so that it propels a portion of the suspension over the mound at a velocity at least equal to MLV as the cross-sectional area decreases in order to carry solid particles over the mound where they are deposited.

The abstract of the '039 patent provides that "[a]n aqueous suspension of solid particles ... is *injected* through a conduit which connects the void with a suitable work surface ... and into the void *at a certain critical minimum rate.*" (Emphasis added).

The description of the preferred embodiment in the specification of the '039 patent states:

[t]he *minimum rate* at which the suspension must be injected can be readily determined by employing, for example, the following formula ... V=XdDv, wherein V is the injection rate of the suspension (cu.ft/min.) ... and v is the minimum linear velocity [MLV] of the suspension.

*Id.* at col. 4, ll. 35–52 (emphasis added).

The written description of the patent specification further describes the mounding process that happens in the void when the minimum injection rate is used: "[t]his [mound formation] is a continuous condition *which is controlled by the rate at which the suspension is introduced into the void,*" and "[t]hus, the distance that the void can be filled is dependent on the *rate at which the suspension is injected into the void.*" *Id.* at col. 5, ll. 17–19 and 24–26 (emphasis added). Moreover, the importance of the injection rate is set out in the written description where it is stated that "the suspension is injected down the conduit [ ] at a certain predetermined critical injection rate ...," *id.* at col. 5, ll. 65–67, and that "the rate at which the suspension is injected through the injection conduit [ ] is *critical* to the practice of the present invention and [ ] can be calculated for any fill material employing the following for-

mula: V=XdDv." *Id.* at col. 6, ll. 17–21 (emphasis added).

During prosecution of the patent application, Dow distinguished its invention from two prior patents, Schmidt, et al. (U.S. Patent No. 2,710,232) and Doolin (U.S. Patent No. 3,440,824), noting that "the rate at which the liquid-solid suspension is injected *must be kept within certain limits,* the rate being dependent on several variables which are set forth in the specification," and that "neither Doolin nor Schmidt et al. suggest[s] any of the critical parameters of Applicants' invention, i.e. a closed system, and a *critical injection rate.*" (Emphasis added.) Dow also stated, in response to the final rejection of its patent application, that "[a]pplicants have proved [ ] that a considerable area of a mined out void can be substantially completely filled to the roof thereof if a *certain minimum injection rate* is employed to inject a suspension of solids in a liquid into a closed system." (Emphasis added.) Dow also stated that:

[t]he formula Applicants have developed concerns the minimum rate (V) at which the slurry must be injected into the void.... *The required minimum injection rate (V) is dependent on the flow characteristics of the slurry in the void* (i.e. minimum linear velocity, particle diameter, etc.) *not on the flow characteristics of the slurry in the injection conduit.* The latter may affect pumping rates and the like which are required in order to achieve the required injection rate (V) but it does not affect the determination of the injection rate (V).

In the appeal to the United States Patent and Trademark Office (PTO) Board of Appeals, the examiner's rejection of the claims was reversed and the '039 patent was then allowed to issue. The Board specifically noted that:

Appellants seek to distinguish their invention over the prior art by arguing principally that no where [sic] in Schmidt et al. is it taught to *inject* the gas-solid dispersion *at any particular*

*critical velocity* .... In addition, appellants assert that Doolin does not teach the *critical parameters* of the invention....

\* \* \*

"[W]e have independently concluded that the applied art does not fairly show such a close relationship between liquid-solid slurry and air-solid suspensions that would make it obvious for one skilled in the art to substitute the liquid-solid slurry of Doolin for the gas-solid suspension of Schmidt, et al. and thereafter change the slurry to a liquid-solid suspension prior to pumping the same in a closed system *at the claimed rate* ...."

(Emphasis added.)

The intrinsic evidence, in the patent and prosecution history, amply demonstrates that step (c) of claim 1 calls for a critical injection rate to achieve mound formation in the manner claimed. Both the specification and the prosecution history repeatedly recite that the use of the critical injection rate is necessary to the practice of the invention.

The Court of Federal Claims, however, relied to a large extent on the testimony of one of Dow's witnesses who opined "that the formula is irrelevant." *Dow I,* 20 Cl. Ct. at 637. Moreover, the inventor called it "the 'brute strength' formula, and analogized using the formula to driving a car through a brick wall at 100 miles per hour when one knows that 10 miles per hour will work." *Id.* The Court of Federal Claims agreed with these witnesses, and specifically stated that the formula is irrelevant. *See id.* In doing so, the Court of Federal Claims did not accord sufficient weight to the intrinsic evidence; in fact, it was largely ignored in the court's infringement analysis. *See Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1308–9, 51 USPQ2d 1161, 1167–68 (Fed.Cir. 1999) (stating that courts should not "rely

on extrinsic evidence in claim construction to contradict the meaning of the claims discernible from thoughtful examination of the claims, the written description, and the prosecution history—the intrinsic evidence."); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582–83, 39 USPQ2d 1573, 1576–77 (Fed.Cir.1996). Instead, the testimony of one of the inventors and other witnesses formed the basis for the court's claim interpretation. This led the court to err in finding that claim 1 step (c) merely describes what happens in the void, but is not a physical act within the control of anyone. *See id.*

■ 3. Neither the '039 patent nor the prosecution history specifically delineates how to arrive at the critical injection rate contemplated by step (c) in terms other than by the formula.[9] Because the patent does not disclose any other method of determining the required injection rate, the government argues that the formula contained in the specification must be used for determining the injection rate called for by step (c) of claim 1. Dow, on the other hand, contends that claim 1, step (c) is independently meaningful, and does not incorporate the formula set out in the specification and in dependent claim 4.

■ The doctrine of claim differentiation can support a broader construction of step (c) of claim 1 because the doctrine creates a rebuttable presumption that each claim in a patent has a different scope. *See Karlin Tech. Inc. v. Surgical Dynamics, Inc.,* 177 F.3d 968, 971–72, 50 USPQ2d 1465, 1468 (Fed.Cir.1999). Thus, the limitations stated in dependent claim 4 should ordinarily not be read into independent claim 1. *See Karlin,* 177 F.3d at 972, 50 USPQ2d at 1468. The doctrine, however, cannot broaden the claims beyond their correct scope. *See Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1480, 45 USPQ2d 1429, 1434 (Fed.Cir.1998). We

9. Dow contends that the patent discloses that the injection rates could be ascertained by experimentation and that the Court of Federal Claims so found. This is incorrect, however,

because the experimentation referred to in the patent and the court's findings related only to MLV, not to the injection rate.

also note that as a general rule claims of a patent are not limited to the preferred embodiment, *see Karlin,* 177 F.3d at 973, 50 USPQ2d at 1469, or to the examples listed within the patent specification. *See Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1551, 37 USPQ2d 1609, 1612 (Fed.Cir.1996).

Applying these principles, we conclude that claim 1 should be given a broader meaning than dependent claim 4. A construction of claim 1, step (c) that incorporates the formula would render claim 4 redundant. There is also some indication that the inventors intended claim 1 to have a somewhat broader scope because it was noted during prosecution that the injection rate "must be kept within certain limits." Thus, although Dow repeatedly emphasized that it deemed the injection rate to be critical (and that it could be calculated by the formula), there is at least some basis for saying that the formula as such was not a rigid requirement. A deviation in the injection rate "within certain limits" would apparently achieve the desired mounding. However, nowhere in the patent nor the prosecution history is there any indication of how large that deviation could be or how it could be determined.

If there were any statement in the patent or prosecution history that a lower injection rate than calculated by the formula was contemplated by the inventors, or ascertainable in some other manner, a reduction in the formula injection rate might be appropriate. There is no such indication. Rather, the written description explains that the formula gives the *"minimum* rate at which the suspension *must* be injected" into the void. '039 patent, col. 4, ll. 35–36 (emphasis added). To the extent that claim 1 may be considered broader by reason of the doctrine of claim differentiation than the injection rate based on the formula in claim 4, and thereby cover a lower injection rate, it can be given broader scope only to a small degree. Accordingly, we hold that the injection rate claimed in claim 1, step (c) can only be slightly lower than the formula injection rate. In order to establish what this lower

rate may be at a given mine filling location it would be necessary for Dow to show that at the lower injection rate mound formation takes place in the manner disclosed in the patent, *i.e.,* by propelling "the suspension over said mound at a velocity at least equal to its minimum linear velocity to carry particles over said mound. . . ." *Id.* at col. 7, ll. 27–29.

Where the claims of the patent, the specification and the prosecution history all demonstrate the importance of the injection rate claimed by step (c) and that it is at least roughly defined by the formula (which is the only basis set out in the patent for determining the injection rate), the Court of Federal Claims' reliance on expert and other testimony to alter the meaning of the claim and to hold that the formula is irrelevant is reversible error. *See Pitney Bowes,* 182 F.3d at 1308–9, 51 USPQ2d at 1167–68; *Vitronics,* 90 F.3d at 1582–83, 39 USPQ2d at 1576–77.

**B. Infringement**

■ The second step of an infringement analysis requires a comparison of the properly construed claims to the device (or method) accused of infringing. *See Cybor,* 138 F.3d at 1454, 46 USPQ2d at 1172; *Markman,* 52 F.3d at 976, 34 USPQ2d at 1326.

The Court of Federal Claims considered two representative projects, the Pittston Avenue/Hickory Street project selected by Dow as its best case for infringement, and the Dunmore/Throop Street project selected by the government as its best case for non-infringement. The court found, based on its construction of the claims, that both projects infringed claim 1 and dependent claims 2 and 3 of the '039 patent.

With respect to the Pittston Avenue/Hickory Street project, the court found that the project specifications called for a closed, pressurized system, using vertical boreholes lined with casing and for the use of a pump designed to deliver the slurry at 50 pounds per square inch (PSI) at the top of each injection borehole. The

court also found that a suspension was contemplated by the use of the term "slurry" in the project specifications and the requirement that the "mixing tank provide sufficient turbulence." *Dow I*, 20 Cl.Ct. at 645. Finally, the court determined that the void was substantially filled with solids based on the completion report prepared by the Bureau of Mines, which performed underground inspections of the mine voids, and on the testimony of Mr. Martinelli, who observed the mines following completion of the project. *See id.* at 646. The court found that the completion report and the testimony supported the conclusion that the void was "substantially filled with solids, as predicted in the '039 patent." *Id.* The court concluded that because mound formation distinguished the '039 patent from the prior art, the mound formation at the project was final evidence of infringement. *See id.*

Based on the project specifications, which required, *inter alia*, vertical boreholes lined with casing, a slurry pump designed to furnish 30 PSI at the top of the boreholes, and pressure gauges at each injection borehole, the court found the Dunmore/Throop Street project utilized a closed pressurized system. *See Dow I*, 20 Cl.Ct. at 646–47. The court determined that the testimony of Mr. Schimmel, a government witness who testified that all pumped slurry projects were conducted in the same manner by the government, supported the conclusion that the project used a closed pressurized system. *See id.* at 647. The court found that the use of a suspension was contemplated because the specifications for the project had provisions detailing the requirements for the slurry plant, which included the ability "to form and pump a suspension...." *Id.* Finally, the court noted that actual observation was not possible in this project, but concluded that because mound formation was inevitable when using a closed pressurized pumped slurry system, the court could infer that more solids than the vol-

ume of a cone the height of a void were injected and that the solids substantially filled the void. *See id.*

Because its construction of claim 1 did not consider the injection rate to be critical, the Court of Federal Claims made no findings relative to the rate at which the suspensions were injected into the mine voids in these selected projects. Additionally, the court's analysis failed to determine whether the mound formations at the two projects were formed in the manner specified in the '039 patent, *i.e.*, "by an injection rate ... sufficiently high to propel the suspension over said mound at a velocity at least equal to its minimum linear velocity to carry particles over said mound ...." '039 patent, col. 7, ll. 20–29.

Based on our construction of claim 1 and the lack of factual findings pertinent to the above-noted claim limitations, we must vacate the Court of Federal Claims' infringement holding and remand the case for further proceedings to determine whether the accused projects practice or infringe [10] the '039 patent under a proper claim construction.

## II. *Validity*

The government argues that if claim 1 is broad enough, as the Court of Federal Claims concluded, to encompass the very low rates employed in the accused projects, then the asserted claims are invalid in light of the Franois patent and the fly ash projects. The government says that "[i]f, as the trial court concluded, the limitations of step (c) are met whenever steps (a) and (b) are combined, then claim 1 was anticipated by any prior art reference that disclosed step (a) and step (b).... The Franois patent and the fly ash projects disclosed just that." On the other hand, the government apparently does not assert invalidity if claim 1 is construed to require an injection rate "about the same as those derived from the specification formula."

---

10. *See infra*, Discussion, part III, reinstating the government's license to practice the invention of the '039 patent until the license

was formally terminated by Dow by letter dated January 10, 1985.

Accordingly, our construction of claim 1 as discussed above makes it unnecessary to consider further the government's invalidity arguments based on the Court of Federal Claims' claim interpretation.

### III. *The License*

The Court of Federal Claims held on motion for summary judgment that "the 1972 license must be considered effectively terminated *ab initio.*" *Dow II,* 32 Fed.Cl. at 16. We review the court's grant of summary judgment *de novo. See Conroy v. Reebok Intl., Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir. 1994). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* U.S.Ct. Fed. Cl. R. 56(c); Fed.R.Civ.P. 56(c).

The government argues that the Court of Federal Claims improperly treated the license as void *ab initio.*[11] The government contends that it did not repudiate the license because its refusal to pay royalties was based on the belief that it had not practiced the invention. The government continues to view the license as being "in full force and effect," and argues that Dow's notice of termination dated January 10, 1985, was ineffective.

Dow contends that the government's failure to pay royalties constitutes a material breach by repudiation which permitted Dow to rescind the license. Dow argues that the Court of Federal Claims correctly held that the license is void *ab initio* because it was repudiated by the government.

We consider first whether the government repudiated the license. "Repudiation is a statement by the obligor to the obligee indicating that the obligor will commit a breach that would itself give the obligee a claim for damages for total breach." *Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* — U.S. —, —, 120 S.Ct. 2423, 2429, 147 L.Ed.2d 528 (2000) (citing Restatement (Second) of Contracts § 250 (1979)) (internal quotations omitted). Repudiation occurs when one party refuses to perform and communicates that refusal distinctly and unqualifiedly to the other party. *See United States v. Dekonty Corp.,* 922 F.2d 826, 827–828 (Fed.Cir.1991) (citing *Dingley v. Oler,* 117 U.S. 490, 499–500, 6 S.Ct. 850, 29 L.Ed. 984 (1886)). The injured party can choose between terminating the contract or continuing it. *See St. Paul Plow–Works v. Starling,* 140 U.S. 184, 11 S.Ct. 803, 35 L.Ed. 404 (1891); *McDonnell Douglas Corp. v. United States,* 182 F.3d 1319, 1327 (Fed.Cir.1999); *Cities Service Helex, Inc. v. United States,* 211 Ct.Cl. 222, 543 F.2d 1306, 1313 (Ct.Cl.1976).

On July 9, 1975, Dow requested from the government an accounting and payment of royalties provided for in the license. The government responded on December 28, 1976, that it did not consider any royalties due on the basis that it was not practicing the invention of the '039 patent. Over the next two years the government and Dow continued to discuss the government's position, as well as reasonable royalty rates, through correspondence and meetings.

On November 2, 1978, the government informed Dow that "new information has

---

11. In support of its argument the government cites the public policy arguments in *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). The Court of Federal Claims noted that *Lear* does allow a licensee to cease payments due under a license while challenging the validity of a patent, but that it does not permit the licensee to avoid the consequences that such actions would bring. *See Dow II* at 16 (citing *Cordis Corp. v. Medtronic, Inc.,* 780 F.2d 991, 995, 228 USPQ 189, 191–92 (Fed.Cir.1985)). The court concluded that the policy rationale of *Lear* does not prevent Dow from terminating the license agreement. In *RCA Corp. v. Data Gen. Corp.,* 887 F.2d 1056, 1064, 12 USPQ2d 1449, 1456 (Fed.Cir.1989), this court stated that "*Lear* does not ... deal with a licensor's right to terminate or rescind a license agreement...." We therefore reject the government's contention as to the applicability of *Lear* to this case.

been developed which raise[s] seriously litigable issues" as to validity and infringement and the "viability and life of any license issued" and that if the '039 patent is valid "it has not been infringed by [government] activities which follow the prior art." The government stated in the November 1978 letter that it was

the [government's] final decision that there has been no substantial, if any, practice of the claimed process which would give rise to a valid claim for payment for royalties under the alleged license or a claim for compensation based on infringement of the patent.

Furthermore, the letter said that "[n]o action will be taken on any further requests for reconsideration of this matter."

On January 10, 1985, approximately six years after the November 1978 letter and two years after this proceeding was commenced, Dow sent the government a letter terminating the license due to the government's material breach by failing to pay royalties, effective "either as of the date of the breach or the date of this Notice, whichever is legally earlier."

The Court of Federal Claims determined that because the government never paid any royalties, did not intend to pay any royalties, and contested the validity of the patent as well as the viability of the license, the government's conduct "constituted a classic breach of contract by repudiation." *Dow II*, 32 Fed.Cl. at 18. The court then found that Dow had lawfully terminated its contract with the government, and held that because Dow's termination abrogated the license to the extent it remained unperformed, and because the government had never performed under the license, Dow's termination had *ab initio* effect, rendering the license void from its inception. *Id.*

The government's November 2, 1978 letter, "clearly and unequivocally expressed its intention to never pay royalties," *id.*, and furthermore showed an intention to challenge not only the validity of the patent, but also the viability and life of the license itself. These actions of the govern-

ment constitute a distinct and unequivocal refusal to perform under the license, thus causing a material breach, or repudiation, of the contract. Accordingly, there are legally sufficient grounds for upholding the determination of the Court of Federal Claims that the government materially breached and repudiated the license.

 Although the government repudiated the license, we are unable to conclude that it should be treated as rescinded or that rescission is the proper remedy. Rescission has the effect of voiding a contract from its inception, *i.e.*, as if it never existed. *See* 17B C.J.S. Contracts § 456 (1999). It is an equitable doctrine which is grounded on mutual mistake, fraud, or illegality in the formation of a contract. *See Roseburg Lumber Co. v. Madigan*, 978 F.2d 660, 665 (Fed.Cir.1992); *American Science and Engineering, Inc. v. United States*, 229 Ct.Cl. 47, 663 F.2d 82, 87 (Ct. Cl.1982); *Pacific Architects and Engineers, Inc. v. United States*, 203 Ct.Cl. 499, 491 F.2d 734, 742 (Ct.Cl.1974). Contract rescission is a remedy which is available under our precedent only when one or more of these circumstances is present. *See Roseburg*, 978 F.2d at 665 (stating that rescission applies when "there has been a mutual mistake of material fact, resulting in a contract which does not faithfully embody the parties actual intent."); *American Science*, 663 F.2d at 87 ("This court will not declare a contract between the government and a private party void ab initio unless there was 'plain illegality' in the contract."); *Pacific Architects*, 491 F.2d at 742 (stating that rescission applies when a party has been induced to enter a contract by material misrepresentation.). Dow does not allege, and the Court of Federal Claims did not find, any such defects that would allow Dow to rescind the license, rendering it void *ab initio*.

 Because rescission is essentially an equitable remedy, it will not ordinarily be invoked where money damages—in this case damages for breach of contract—will adequately compensate a party to the con-

tract. *See* 17B C.J.S. Contracts §§ 467, 476 (1999). Neither Dow nor the Court of Federal Claims has pointed to any reason why contract damages for breach are not adequate here.

Thus, neither the government's actions nor Dow's termination letter provides a basis for rescission of the license. Consequently, we reverse the determination of the Court of Federal Claims that the license should be considered void *ab initio*.

The government argues that Dow could not terminate the license for non-payment of royalties because the license contained no provision for termination by Dow. It contends further that even if Dow had a right to terminate the license, it waived that right by continuing to urge the government to perform and by failing to terminate the license in a reasonable time after the repudiation.

A material breach, or repudiation, gives rise to a right to exercise a termination provision in a contract. *See, e.g., McDonnell Douglas,* 182 F.3d at 1327; *Cities Serv.,* 543 F.2d at 1313. Moreover, under the circumstances of this case, the absence of an express termination clause would not ordinarily prevent a party from ending the contract. *See, e.g., Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 217 F.3d 8, 10 (1st Cir.2000) ("Every contract involves a bargained-for exchange of obligations, the material breach of which by one party gives the other party a right to terminate."); *Apex Pool Equipment Corp. v. Lee,* 419 F.2d 556, 562 (2d Cir.1969) (stating that a right to terminate upon material breach is implied in many contracts); *see also* Restatement (Second) of Contracts § 237 (1981).

▇ As to the government's waiver argument, we are not persuaded. This court stated in *McDonnell Douglas,* 182 F.3d at 1327, that "[a] party that chooses to proceed with the contract—even if it is the government . . .—does not thereby waive its right to terminate for default." Although one of our predecessor courts stated that a failure "to take action to end the agreement within a reasonable time after

becoming aware of the facts" may result in a waiver, it also noted that the strict application of the election [waiver] doctrine, *i.e.,* the doctrine that a non-defaulting party has an election either to end the contract or to continue performance, has sometimes been modified. *Cities Serv.,* 543 F.2d at 1313 (citing *Northern Helex Co. v. United States,* 197 Ct.Cl. 118, 455 F.2d 546, 553 (Ct.Cl.1972)). In *Cities Service,* the court also noted that:

> [s]ome courts have shared Professor Corbin's view that an election [waiver] should not be conclusive unless facts giving rise to an estoppel exist; either the breaching party must have changed his position in reliance on the injured party's failure to cancel or the injured party's conduct must be such that it would be unjust to allow him to change his position.

543 F.2d at 1314 (citing 5A A. Corbin, Contracts § 1220 (1964)).

Applying these principles, we conclude that the government's material breach and repudiation of the license gave Dow the right to either terminate the license or continue to treat it as outstanding. The government's challenge to the validity of the patent and the viability of the license, together with the refusal to pay any royalties, made the absence of a termination clause in the license immaterial. Under these circumstances, a termination right is properly implied. *See Ross–Simons,* 217 F.3d at 10; *Apex Pool,* 419 F.2d at 562. During the ensuing period from 1978 until suit was filed and the license was formally terminated in January 1985, there is no evidence that the government was prejudiced by Dow's delay in terminating the license. Further, the government has not argued that Dow was estopped from terminating the license for reasons similar to those suggested by Professor Corbin. *See Cities Serv.,* 543 F.2d at 1314.

We conclude that the government repudiated the license, and that Dow had a right to terminate the license that was not waived. Consequently, Dow's letter of

January 10, 1985 effected a termination of the license on the date it was received by the government, *viz.*, January 18, 1985.

### IV. *Statute of Limitations*

■ Because we reinstate Dow's breach of contract claim under the Tucker Act, we must consider whether this claim is barred in whole or in part by the statute of limitations provided for in 28 U.S.C. § 2501. The statute provides:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

28 U.S.C. § 2501.

The government contends that the Court of Federal Claims erred in finding Dow's complaint to be timely filed. With respect to Dow's breach of contract complaint, which was filed on January 17, 1983, the government argues that it was filed more than six years after Dow first learned in the letter of December 28, 1976, that no royalty payments would be made.

The Court of Federal Claims held, and we agree, that the November 1978 letter, and not the 1976 letter,[12] constituted a repudiation and breach of the license. The unequivocal statements in the 1978 letter that the government would not pay royalties (based not only on non-use of the patented invention, but also on the belief that both the patent and the license were invalid) and that no further reconsideration of the matter would be entertained fully support the Court of Federal Claim's conclusion. The government's repudiation of the license in the November 1978 letter

first gave rise to Dow's cause of action for contract damages. Since Dow filed suit on January 17, 1983, its breach of contract action was timely filed and is not barred by the statute of limitations.

### V. *Damages*

After finding Dow's patent valid and infringed and the license void *ab initio*, the Court of Federal Claims awarded infringement damages pursuant to 28 U.S.C. § 1498.[13] It concluded that a reasonable royalty was 15% of the value of the property saved (or benefit conferred) and that Dow was entitled to additional compensation for the delay in the payment of that royalty. In making its determination, the court rejected the royalty rates that had been discussed by Dow and the government as irrelevant due to its holding that the license was void *ab initio*. *See Dow II*, 32 Fed.Cl. at 21. The court also rejected the settlement agreement reached between Dow and the Pennsylvania Department of Environmental Resources, which the court did not consider to be sufficient to support a finding of an established royalty rate. *See id.* at 22. Instead, the Court of Federal Claims employed the "willing buyer/willing seller" approach outlined in *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), *modified* 446 F.2d 295 (2d Cir.1971). The court considered the factors enumerated in *Georgia–Pacific*, and specifically emphasized that the benefits from the use of the invention were great, and that these benefits were stressed by the government when asking

**12.** The Court of Federal Claims held that the government's response in the December 28, 1976 letter that no royalties were due was based solely on the government's belief that it had not practiced the invention covered by the patent. *See Dow II*, 32 Fed.Cl. at 20. We agree. The parties continued to negotiate, until 1978, whether the government had used the invention at all. Any payment of royalties was necessarily contingent upon use. Not only had the issue of use not been settled, but

the parties had not concluded negotiations over the royalty to be paid.

**13.** 28 U.S.C. § 1498 states:

> Whenever an invention described in and covered by a patent of the United States is used ... by or for the United States without a license of the owner thereof ... the owner's remedy shall be ... the recovery of his reasonable and entire compensation for such use....

for funding for the projects. It also concluded that the invention was extraordinary, which warranted an increased rate of compensation. The court held that a reasonable royalty rate would be 15% of the benefit conferred, i.e., 15% of the "value of property saved." *Dow II,* 32 Fed.Cl. at 15.

Because of our decision that the license remained in effect until it was terminated by Dow on January 18, 1985, we vacate the damages award of the Court of Federal Claims and remand this case for recalculation of damages consistent with this opinion.

■ If and to the extent the government practiced the invention of the '039 patent in the period prior to the termination of the license on January 18, 1985, the provisions of that agreement are applicable in calculating Dow's damages for breach of contract. Following termination, infringement damages are applicable to any infringing activities by the government.

■ The method used by the Court of Federal claims to compute infringement damages, however, is too speculative to stand. The underlying base to which the court applied its selected 15% royalty rate was a percentage of the estimated decline of private property values that might occur if the abandoned coal mines were not filled, and then collapsed. While such hypothetical losses of property values may have been effective in seeking funding for mine filling projects, they bear little relationship to what a willing buyer and a willing seller would use in the real world to negotiate a royalty rate. All of the evidence before the court relating to Dow's proffered royalty rates to the government and others indicated that total project costs or quantities of materials should be the base for calculation of royalties. As our predecessor court has stated, in § 1498 cases "[t]he proper measure [of damages] is what the [patent] owner has lost, not what the taker has gained." *Leesona Corp. v. United States,* 220 Ct.Cl. 234, 599 F.2d 958, 969, 202 USPQ 424, 435 (Ct.Cl.1979) (citing *United States v. Chandler–Dunbar Water Power Co.,* 229 U.S. 53, 76, 33 S.Ct. 667, 57 L.Ed. 1063 (1913)). Evidence of the benefit conferred is infrequently used in § 1498 cases, and then "only when the calculation of a reasonable royalty [is] difficult." *Leesona,* 599 F.2d at 971, 202 USPQ at 436. There is no evidence in this case that Dow ever advanced (or that a potential licensee of the '039 patent ever considered) a royalty unrelated to project costs or quantities. The Court of Federal Claims should not have resorted to a benefit conferred method where "means exist[ed] ... for a more conventional and substantiated measure" of damages. *Decca, Ltd. v. United States,* 225 Ct.Cl. 326, 640 F.2d 1156, 1172, 209 USPQ 52, 64–65 (Ct.Cl.1980).

## CONCLUSION

For the above reasons, we remand the case for further proceedings consistent with this opinion.

## COSTS

Parties shall bear their own costs.

*AFFIRMED–IN–PART, REVERSED–IN–PART, VACATED–IN–PART, AND REMANDED.*