**ALASKA PULP CORPORATION, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 95–153C.

United States Court of Federal Claims.

Feb. 14, 2001.

Terrence O'Donnell, Washington, D.C., with whom were Ari S. Zymelman (argued), Robert A. Van Kirk, Michael J. Lawson, and Christine A. Murphy, for Plaintiff.

Jane W. Vanneman, Washington, D.C., with whom were Acting Assistant Attorney General David W. Ogden, Director David M. Cohen, Bryant Banes, John Einstman, Virginia Farrier, Jan Folena (argued), John Field, Laureen Kapin, and Karen Norington for

Defendant. Of counsel: Lesli Lagomarcino, Washington, D.C., and Tim Obst, Juneau, AK, Department of Agriculture.

## OPINION

BASKIR, Chief Judge.

Plaintiff, Alaska Pulp Corporation ("APC"), alleges that the United States Forest Service in various ways breached its timber contract. Among other things, APC claims that the government's implementation of the Tongass Timber Reform Act, Pub.L. No. 101–626, 104 Stat. 4426 (1990) ("TTRA"), repudiated and materially breached the contract with APC. The matter before us is APC's motion for partial summary judgment regarding the government's liability on the TTRA claim.

While admitting that the TTRA breached the contract, defendant contends that APC has failed to establish that it was materially harmed by the statutory provisions. Furthermore, defendant asserts that even if the government repudiated the contract, it may not be held liable because the TTRA was not the operative cause of APC's economic problems, and because APC waived its repudiation claim.

We reject each of defendant's arguments and GRANT plaintiff's motion for partial summary judgment as to liability.

## BACKGROUND

We have dealt extensively with some of the facts of this case in adjudging other cross-motions for summary judgment. Previously the issues involved the proper interpretation of the contractual obligations of the parties, specifically whether APC was required to operate a pulp mill for the entire period of the contract. We held that it was not. *Alaska Pulp Corporation v. United States,* No. 95–153C (Fed.Cl., May 25, 2000)(unpub.) We repeat many of those same, undisputed facts below.

### The Contract

In October 1957 the United States Forest Service and a Japanese company then known as the Alaska Lumber & Pulp Co., Inc. (subsequently renamed Alaska Pulp Corpora-

tion), entered into Timber Sale Contract No. 12–11–010–1545 ("Contract"), a 50–year contract for the sale of timber in the Tongass National Forest in the then-territory of Alaska. The United States Forest Service permitted APC to cut timber and purchase the logs, and APC agreed to do so subject to certain conditions.

The contract also provided for the manufacture of the raw materials harvested. With limited exceptions, the purchaser was not free to export unprocessed timber for primary manufacture elsewhere—this restriction is referred to as the "primary manufacture" or "processing" requirement. Initially, APC met the primary manufacture requirement by processing timber through a pulp mill and a saw mill it erected pursuant to the contract. Lower quality logs, which made up a large percentage of the timber in the Tongass, were processed into pulp and sold to support rayon and paper markets in Japan. In addition to pulp manufacturing, APC cut higher quality sawlogs, processed locally via its saw mill.

The arrangement was mutually beneficial, at least at its inception. The Japanese corporation, faced with scarce timber resources in its own country, secured a long-term source for timber products. The United States, on the other hand, made productive use of its national forests and sparked industrial development in Southeastern Alaska. Plaintiff operated the pulp mill from 1961 until 1993, temporarily suspending operations on a few occasions for various reasons. However, over the course of time the market for pulp weakened, making that aspect of the timber contract less desirable than it once was to APC. The landscape changed for the government, as well. Although the promotion of industry in Alaska was still a goal of the United States, it is fair to say that an environmental conservation agenda dormant at the contract's inception made its way to the forefront of United States domestic policy by the early 1990's. That and the perception that long-term contractors like APC enjoyed unfair competitive advantages over independent timber purchasers in Alaska, made this contract potentially costly for the United States. In fact, these issues prompt-

ed legislation that was introduced in Congress to terminate APC's timber contract.

### Early Legal Disputes

Thirty years into the contract the parties began repositioning themselves. As plaintiff describes it, a dispute arose "over the economics of the timber" supplied under the contract. Pl. Br. at 5. In 1987, APC filed a suit in this Court (Cl.Ct. No. 675–87) seeking over $80 million in damages. A period of negotiations culminated in 1990 with the "settlement contract." Pursuant to the settlement, APC abdicated much of its role in the selection of timber for harvesting. Defendant agreed to incorporate into the contract the "mid-market test," which applied certain cost and pricing criteria to timber offerings to achieve an economic return on the timber. The "test" was apparently intended to rectify some of the complaints that led to the lawsuit and to compensate for APC's diminished role in timber selection under the contract amendments. The settlement contract was executed by APC and the Forest Service in June 1990 and its modifications were put into effect as of July 1, 1990.

### Enactment of the TTRA

With the ink on the settlement barely dry, Congress five months later passed the Tongass Timber Reform Act on November 28, 1990. The thrust of the TTRA was a specific directive to the Department of Agriculture and its subordinate agency, the Forest Service, to modify its contract with APC and another cited contractor. The statute declared several goals and, specifically identifying APC's contract, ordered that the agreement be unilaterally modified in order to carry out these goals. The Forest Service implemented the statute on February 26, 1991, transmitting to APC a revised text of the contract reflecting the unilateral modifications. Three of these unilateral changes are cited by APC as material breaches: (1) the mandatory "mid-market test" just negotiated as part of the settlement contract was now optional on the part of the Forest Service; (2) the pricing mechanism was changed to remove any advantage APC enjoyed over competitively bid independent timber sales; and (3) utility logs were now to be counted as part of the quantity APC could log.

### Relations After the TTRA

The period between the enactment of the TTRA in November 1990 and the government's decision to terminate the contract in early 1994 is central to the dispute between the parties, and particularly to the issues immediately before us. While plaintiff objected to the unilateral changes imposed by TTRA, it continued to perform under the contract, at least in part. The government contends that APC acquiesced in the government's performance as modified by the Act and thus waived any rights it might have had under a repudiation/material breach theory. Plaintiff argues that it continued to observe the contract even as it pursued negotiations in an effort to preserve the basic contractual relationship. Apparently these negotiations continued from early 1991 before the new terms went into effect, at least until APC challenged the TTRA terms in U.S. District Court in June 1993, and perhaps even after it brought that suit.

Plaintiff's suit in United States District Court in Alaska sought to nullify the TTRA changes and to enforce the terms of the settlement contract, citing the Administrative Procedures Act, 5 U.S.C. §§ 701–706, and the Declaratory Judgment Act, 28 U.S.C. § 2201. *Alaska Pulp Corporation v. United States*, Case No. J93–010 (D.Alaska 1993).

While pursuing injunctive relief in the District Court, APC informed the Forest Service on June 30, 1993, that it intended to suspend operations of the pulp mill indefinitely beginning September 30, 1993. In justification, it cited the government's administration of the contract under TTRA and adverse conditions in the pulp market. The company declined at that point to exercise its right to request a contract extension under section 5a(2), the contract's *force majeure* clause, but reserved the right to do so at a later date. Meanwhile it explored other means of satisfying the primary manufacturing clause of the contract, including the possibility of converting the pulp mill into a facility to produce medium density fiberboard ("MDF"). In an exchange of correspondence over the next few months, APC sought government approval. The Forest Service did not expressly reject the option. It allowed APC some leeway

while reserving its right to suspend or terminate the contract for APC's alleged breach in closing the pulp mill. Several months passed but, according to defendant, APC offered no firm commitment to convert the mill to a MDF facility.

Although it had halted pulp mill operations, APC continued logging at the maximum levels allowed under the contract, ostensibly "in order to provide the needed wood supply for the sawmill and to protect the remaining jobs." Roppel correspondence to Regional Forester (June 30, 1993). APC also continued to manufacture hardwood timber in-State as required by the contract. However, the sawmill was incapable of processing the lower-grade pulp wood. At that time—1993—APC asserts it had already satisfied the minimum cut and processing requirements under the contract for the current five-year operating period, 1991–1996. Thus, it had no immediate need to process pulp. But, under the terms of the contract it could not cut and export pulp wood in the next five-year period unless the wood was processed either in a revived pulp mill or, perhaps, by some other means.

### Termination of the Contract

Six months after the Alaska lawsuit was filed and the pulp mill was closed, the Forest Service advised APC that its actions in closing the mill constituted a material breach of the contract. On January 13, 1994, the contracting officer issued his termination notice. Subsequently, on April 14, 1994, he terminated the contract, alleging material breach by APC. The district court action, overtaken by events, was dismissed. On December 23, 1994, plaintiff filed a certified claim with the contracting officer, pursuant to the Contract Disputes Act, 41 U.S.C. § 605(c)(4), for $1,058,086,583. That claim was denied on November 9, 1995, but only after this Court directed the contracting officer to issue a final decision. *Alaska Pulp Corp. v. United States*, 34 Fed.Cl. 100 (1995).

### APC's Claims

Plaintiff's lawsuit in this Court, filed on March 3, 1995, alleges several theories of government liability. First, APC cites the enactment and implementation of the TTRA as a material contract breach excusing fur-

ther performance by APC. Complaint, ¶ 63. Second, APC claims the government termination of the contract in January 1994 was unjustified and therefore a material breach. Complaint, ¶¶ 64–66. And finally, APC attacks the contracting officer's independence, good faith and fair dealing. Complaint, ¶¶ 67–68. On May 25, 2000, we held against the government on its claim that the contract required APC to operate the pulp mill for the entire course of the 50–year contract. To the extent, then, that the termination was based on this supposed requirement, it was wrongful. We left open for further briefing whether there was some other justification for the government's termination. The present motion, then, concerns only the plaintiff's TTRA claims.

In Title III of the TTRA—"Modifications of Long–Term Timber Sale Contracts in Southeast Alaska"—Congress directed the Secretary of Agriculture to revise the long-term contract between the Forest Service and APC. The statute characterized these revisions as "unilateral changes." § 301(c). The Secretary had only 90 days after enactment to comply with the unilateral changes set forth within the statute. § 301(d). Neither the original contract nor the settlement contract provided for modification of the agreement without the consent of both parties.

Plaintiff has challenged three of these revisions—sections 301(c)(6), 301(c)(8), and 301(c)(9)—claiming that those provisions materially affect the agreed upon timber quantity, price and value, respectively. In its motion for summary judgment, APC alleges that the Forest Service's implementation of the these TTRA terms constituted both a repudiation and a material breach of the long-term timber contract. While the government concedes that the legislation constituted a "breach," it denies that the breach was material as to any of the three new terms. In the next section, we examine each of these arguments in detail.

### DISCUSSION

#### The Law of Repudiation and Material Breach

Generally, repudiation is a breach of contract characterized by prospective nonperfor-

mance. A contract is repudiated when a party owing performance indicates by word or deed that it will commit a breach that would of itself give the injured party a claim for damages for total breach. RESTATEMENT (SECOND) OF CONTRACTS § 250 (1981). To warrant a claim for total breach, the resulting nonperformance "so substantially impairs the value of the contract to the injured party *at the time of breach* that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." REST. 2D at § 243(4)(emphasis added). One important consequence of repudiation, among other things, is that the injured party is discharged of its performance obligations. REST. 2D at § 253(2).

The archetypical repudiation, therefore, occurs when one party to a contract attempts to unilaterally alter the contract or to condition his performance on terms that were not part of the bargain. *See, e.g., Louisiana–Pacific Corp. v. United States,* 228 Ct.Cl. 363, 366, 656 F.2d 650, 652 (1981)("It is hornbook law ... that the Government cannot terminate or change one of its contracts in whole or in part without consent of the other contracting party, without being held liable in damages for breach of contract"); *SMS Data Prods. Group, Inc. v. United States,* 17 Cl.Ct. 1, 9 (1989); *see also,* E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS § 8.21 (2d ed.1998)(demand for performance on terms that go beyond the contract is a repudiation when coupled with threat of nonperformance in the event terms are not accepted).

The result is no different where the government as a party to the contract commits this same sin through subsequent legislation. In *Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000), the Supreme Court considered whether legislation repudiated contracts between the United States and a number of oil companies. The oil companies executed leases with the government to explore for oil off the coast of North Carolina. Among its promises, the government had agreed to review and act on the companies' exploration plan applications within 30 days of receipt. Subsequent to the government's promises, Congress passed the Outer Banks Protection Act, Pub.L. 101–380, 104 Stat. 555 (1990) ("OBPA"), which imposed a temporary moratorium on the exploration activities. Just as TTRA specifically targeted APC's timber contract, the OBPA identified the leases at issue in *Mobil.* And as with the TTRA, the OBPA tied the hands of federal government officials administering the contract—the government was forced to suspend performance of its agreement in order to comply with the moratorium. *Mobil,* 530 U.S. 604, 120 S.Ct. at 2435. Because the 30–day promise was negated by the legislative moratorium, the Court characterized the statute as a repudiation and held the government liable for material breach of contract. *Id.,* 530 U.S. 604, 120 S.Ct. at 2436.

The rules regarding material breaches are closely related to the law of repudiation. Not every violation of a contractual provision results in a material breach, of course. But if found to be material, the breach has far-reaching consequences. Like the repudiated contract, material breach terminates the contract, relieving the injured party of its remaining duties of performance. FARNSWORTH at § 8.20; REST. 2D at § 243 cmt. a. If the 1990 TTRA and its implementation constitute a repudiation/material breach of the timber contract, APC's subsequent conduct would have a different legal import. Thus, its closing of the pulp mill without providing for alternate means of primary manufacturing could not amount to an APC breach justifying the contracting officer's 1994 termination.

The law in this jurisdiction is clear. In determining the materiality of a breach we review the totality of events and circumstances. *Stone Forest Indus., Inc. v. United States,* 973 F.2d 1548, 1552 (Fed.Cir.1992)(citing REST. 2D at § 241). This flexible approach examines the nature and effect of the breach in light of how the contract was viewed, bargained for, entered into, and performed. *Id.*

### Summary Judgment is Appropriate

Summary judgment is appropriate where there are no genuine issues of material fact in dispute and the moving party is entitled to

judgment as a matter of law. RCFC 56(c). The movant must establish the absence of any dispute of material fact, a fact of consequence to the outcome of the case. *Cincom Systems, Inc. v. United States*, 37 Fed.Cl. 663, 670 (1997). Inferences drawn from the evidence are viewed in the light most favorable to the opposing party. *Id.* We will review each breach in turn after first commenting on the approach of defendant's opposition.

In an effort to avoid resolution of its TTRA liability on motion, the government contends that there are material issues of fact in two respects. First, it argues that APC's economic condition would have made it impossible for it to perform the contract in any event, and determining that condition is a disputed matter of fact. Second, it argues that the actual effect of the TTRA changes in the period after the implementation of the Act shows that the statutory changes did not have a material impact on APC. Gauging this post-breach actual impact also involves factual disputes.

In the government's briefing of this motion we noted persistent references to APC's financial condition and its alleged inability to perform its own obligations under the contract; defendant proffers this evidence in an attempt to set up factual disputes barring summary judgment. *See, e.g.,* Def. Opp. at 10 ("*as a factual matter,* APC's financial, environmental, market, structural, and other non-TTRA problems preceded and extended throughout the period in which TTRA was effective and APC cannot recover from the Government.") Even if true, these facts do not raise a genuine issue of material fact, at least not at this stage in the proceedings. This "operative cause" theory relies heavily on the case of *Marathon Oil v. United States,* 177 F.3d 1331 (Fed.Cir.1999), a case cited throughout the defendant's opposition brief. There the Court of Appeals reversed our finding of material breach "because the moratorium legislation was not the operative cause of Marathon's failure to obtain the required permits". *Id.* That case has since been reversed by the Supreme Court. *See Mobil,* 530 U.S. 604, 120 S.Ct. at 2437 (rejecting argument that repudiation could not have

hurt oil companies because of State permit denials).

As the *Mobil* case illustrates, liability for breach does not turn on the economic viability of the promisee or intervening post-breach events. Because the State had rejected their applications for required environmental permits, the oil companies in *Mobil* would not have been permitted to drill for oil irrespective of the government's breach. The government there had argued, as it does here, that any statutory interference could not constitute a repudiation or material breach where the promisee was unable to perform for reasons independent of the breach/legislation. The Supreme Court dismissed this argument with the analogy of a broken promise to deliver a lottery ticket that subsequently does not win. *Mobil,* 530 U.S. 604, 120 S.Ct. at 2437.

In this regard, therefore, defendant's socalled factual disputes do not prevent summary judgment, as they have no effect on the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The materiality of the breach is not affected by its actual consequences or by the measure of harm that flows from the breach. *See Mobil,* 530 U.S. 604, 120 S.Ct. at 2437 ("Because the Government repudiated the lease contracts, the law entitles the companies to that restitution whether the contracts would, or would not, ultimately have produced a financial gain . . ."); *see also, Thomas v. HUD,* 124 F.3d 1439, 1442 (Fed.Cir.1997)(government breached nondisclosure agreement by releasing to potential employer adverse information concerning petitioner; breach was material notwithstanding fact that confidential information had no bearing on hiring agency's decision not to employ petitioner.)

Using this same discarded theory of measuring post-breach actual harm, the government has also sought to rebut the materiality of its particular breaches by attempting to minimize the actual effect of the unilateral terms on APC's corresponding contractual rights. For instance, it contends that the TTRA change in the pricing formula had no effect during the post-TTRA period because

APC offset any price increases by means of "road credits." (It also argues that a $5 million cost increase was legally *de minimis*, and that it is pure speculation whether the new term would have increased timber prices to APC.) But the government has not otherwise challenged APC's claims of material harm, nor properly met its burden of raising a material issue of fact concerning breach materiality.

The government's post-breach theory is best discussed with respect to the TTRA change in the calculation of timber volume. Based on Forest Service calculations, APC estimated that the TTRA modification of counting unmerchantable utility logs toward contract volume reduced the amount of economically valuable timber by approximately 18–20 percent. The government rejects this Forest Service estimate by challenging the methodology by which it was derived. It contends that in fact no precise evaluation of the actual impact is possible. Defendant simply throws up its hands and declares "it is difficult to know precisely what the effect, if any, of the utility log provision would have been for the entirety of APC's contract". Consolidated Statement of Uncontroverted Fact ("CSUF"). By the government's reasoning we would have to wait until the contract's end, the year 2011, before the true impact could be calculated.

Liability for a material breach requires an evaluation of the breaching party's conduct in light of the contractual expectations of the parties. The assessment is made as of the time of breach, and must at least show that the breach was not minor or *de minimis*. *See, e.g., Mobil*, 530 U.S. 604, 120 S.Ct. at 2436 ("Government's modification of the contract-incorporated processes was not technical or insubstantial"); *see also*, REST. 2D at § 243(4) (resulting nonperformance "so substantially impairs the value of the contract to the injured party *at the time of breach* that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.")(emphasis added). Furthermore, *Mobil* instructs that the assessment is not of the actual, ultimate impact in light of the supervening events. *Mobil*, 530 U.S. 604, 120 S.Ct. at 2430, 2437. De-

pending on the nature of the breach, it may be possible to quantify or estimate the impact on contractual rights as of the time of the injury. *See generally, Stone Forest*, 973 F.2d at 1551–52; *Everett Plywood Corp. v. United States*, 206 Ct.Cl. 244, 512 F.2d 1082, 1093–94 (1975). In appropriate cases, this estimate may thus be the measure of whether the breach was material or minor.

As to defendant's attack on the estimate's methodology, any estimate is necessarily imprecise and vulnerable to criticism. And defendant is not bound by its own agency's projections. Yet before putting the Forest Service's estimate in factual dispute we require the government to proffer other estimates to show that the effect of counting utility logs was *de minimis*. It is not enough for the government simply to challenge the precision of APC's estimate. *See, e.g., Applied Companies v. United States*, 144 F.3d 1470, 1474–75 (Fed.Cir.1998)("conclusory statement on the ultimate issue does not create a genuine issue of fact.")(quoting *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed.Cir.1990)); *SMS Data*, 17 Cl.Ct. at 6 (mere denials or conclusory statements are not sufficient to create evidentiary conflict) (citation omitted); RCFC 56(d)(2)(opposing party "shall state the precise nature of its disagreement and give its version of the events, supported by record citations.") But the government most decidedly never goes beyond challenging the reliability of APC's estimates of the impact on volume. The same is true with its arguments concerning the remainder of the unilateral terms. Aside from its *Marathon* theory, the government never proffers alternative estimates, nor does it suggest what the threshold of materiality might be. Consequently, defendant has not met its burden of establishing a genuine issue of a material fact as regards questions of breach materiality.

As its primary support for the proposition that materiality is too fact-intensive for resolution by summary judgment, defendant cites the *Stone Forest* case. Def. Opp. at 23. While *Stone Forest* provides guidance for determining the materiality of a breach when that can be estimated or quantified, it cer-

tainly does not prohibit the application of summary judgment to the question. In fact, the trial court decided that case *as a matter of law*. *Stone Forest*, 973 F.2d at 1550. On facts similar to those here, the Court of Appeals reversed and held, again as a matter of law, that the government's reduction of timber volume constituted a material breach. *Id.* at 1552. Likewise, the Supreme Court, in *Mobil*, decided the issue of breach materiality as a question of law. Even the lone dissent, which would have addressed materiality in the context of the subsequent state permit delays, regarded materiality as a question of law. *See Mobil*, 530 U.S. 604, 120 S.Ct. at 2438–45 (Stevens, J., dissenting). We now turn to that question.

### Materiality of the TTRA Changes

Title III of the TTRA explicitly requires the modification of this particular APC timber contract. In no uncertain terms, the TTRA conditions the government's own performance on the incorporation of the required revisions into APC's contract. *See* § 301(d)("At such time as the Secretary transmits the modified contracts to Congress, or ninety days after the date of enactment of this Act ... the Secretary *shall conduct timber sale operations on the Tongass National Forest only in accordance with the provisions of the modified contracts.*")(emphasis added). The parties do not dispute that the TTRA's modifications were unilaterally imposed. They also agree that neither the original contract nor the settlement contract provided for such modifications without the consent of both parties. The TTRA was, therefore, a potential repudiation.

The government has conceded in oral argument that these unilateral terms constituted a simple breach of the contract. It remains to determine whether the changes compelled by the Act constitute a material or total breach, a legal conclusion hotly disputed by the parties.

### 1. Economic Value

■ Of the three changes dictated by TTRA, the elimination of the mid-market test presents the most vivid example of a contractual *quid pro quo* contravened. As we noted in our Background section, the provision was newly written into the 1990 contract as an explicit part of the settlement of *Alaska Pulp Corp. v. United States*, No. 675–87 (Cl.Ct.1987). According to plaintiff, its case demonstrated that the Forest Service timber offerings were uneconomical and a violation of the original contract. The contract required that a 5–year timber offering satisfy a series of criteria, including that it be "economical." But the original contract did not provide a mechanism for determining whether that factor was satisfied. The mid-market test was designed to eliminate the disputes between the parties over the economic viability of future timber offerings. The test provided a verifiable formula and benchmark for evaluating the offering.

The mid-market test in section 7c of the settlement contract establishes a standard timber value arrived at by factoring in a variety of typical logging and other costs in order to improve the chances of an economic return for APC from a timber offering. The contract provided a detailed set of criteria for assessing timber. To meet the mid-market standard the timber "would provide a weighted average margin for profit and risk of at least 60% of normal." Settlement Contract, § 7c(4)(b). Along with the adoption of a mid-market test, the settlement contract also altered the roles of the parties in selecting the timber to be harvested in any given 5–year operating period. Under the original contract, APC designated the operating area and the Forest Service was then entitled to make modifications; disputes were subject to an arbitration procedure. Contract, §§ 7a(2)-(5). Under the 1990 revisions, APC gave up its power to propose a harvesting area, retaining only a consulting role. In consideration for this change in roles the Forest Service's offerings were required to meet the mid-market test. *See* Settlement Contract at § 7c(4)(a).

Section 301(c)(9) of the TTRA required the Secretary of Agriculture to ensure that timber offered APC meets economic criteria consistent with that of independent national forest timber sales. In response to the statute, defendant did away with the mid-market test; the government was no longer obligated to conduct that particular analysis. *Com-*

*pare* Settlement Contract at § 7c *and* Unilateral Terms at 301(c)(9). The Forest Service would continue to propose the periodic timber offerings and appraise all offerings according to general economic criteria. And APC was left with its consulting role and ultimate veto of any timber offering it believed was not economically viable.

The mid-market test was prescribed for all operations subsequent to the modifications agreed upon by the parties, that is, post 1990. Settlement Contract, § 7e(3). However, the precise assessment called for by the settlement contract was never actually applied to APC offerings during the brief 8–month period after settlement and before implementation of the unilateral terms. Although the TTRA negated the settlement contract's mid-market test provisions, the government points out that the Forest Service Handbook reflected a government policy to apply a general mid-market assessment to timber harvests in the region. So we are presented with two questions: Does either the substitution of government policy for contractual obligation, or the lack of a demonstrated impact on APC, prevent the TTRA change from being considered a material breach? We answer both questions in the negative.

As to the latter, defendant argues that determining the effect of eliminating the mid-market assessment is a fact-intensive analysis with ample room for disagreement, particularly in regards to the calculation and valuation of the financial effect of the modification. The government couches this theory in terms of APC's financial woes and its inability to continue to harvest timber under the contract. *See* Def. Opp. at 21 ("the mid-market test is something of a red herring because it would not have cured APC's fundamental business problems.") This focus on the "primary operative cause" of APC's economic problems, Def. Opp. at 15–22, is the *Marathon* approach which was rejected by the Supreme Court. *Mobil,* 530 U.S. 604, 120 S.Ct. at 2437. We reject it here, as well, for reasons we have previously discussed.

The TTRA "effect" that is not in dispute and that does go to liability is that APC has lost its contractual *guarantee* that it specifically negotiated. In its assessment of a breach involving a settlement agreement, the Court of Appeals for the Federal Circuit noted that such a breach is material when it "relates to a matter of vital importance, or goes to the essence of the contract." *Thomas,* 124 F.3d at 1442 (citing 5 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1104 (1964)). The petitioner in that case settled claims against its employer, Department of Housing and Urban Development, and agreed to resign in exchange for the agency's promise not to disclose information to future potential employers regarding his job performance. The information was subsequently released, but allegedly had no effect on his future employment—this factor led the Merit Systems Protection Board to find that the agency's breach was not material. On appeal, the Court disregarded the Board's focus on post-breach effects, and rejected the notion that the release of information caused no practical harm to the plaintiff. *Id.* ("Even if that testimony were believed, that knowledge ... would put a responsible employing official on inquiry notice, which was exactly what Thomas wanted to avoid.") The breach was considered material, whatever the ultimate outcome, because the injured party lost "the major benefit that [he] received in exchange for agreeing" to settle his legal claims. *Id.*

Likewise, in this case the adoption of the mid-market test was a significant aspect in APC's decision to dismiss its $80 million lawsuit against the government in favor of a new agreement. Clearly, APC relied upon protections afforded by the economic criteria embodied in the mid-market test when it ceded to the Forest Service the right to select the timber to be cut. The fact that the Forest Service continued to employ an appraisal system, even if it was the functional equivalent of the mid-market test, does not placate APC—its contractual guarantee has been replaced with a discretionary measure. We are also not persuaded by the government's argument that $1 million in damages—a figure that represents APC's mid-market damages according to defendant—are minimal. Def. Opp. at 21. We will leave the damages for another day. The provision

was "a matter of vital importance" to APC and, as such, its statutory rejection was a material breach. *Thomas,* 124 F.3d at 1442.

### 2. Timber Pricing

■ Plaintiff next alleges the TTRA repudiated contractual provisions for determining stumpage rates, the term used to describe timber pricing. The statute required APC's contract to be modified "to assure that the price of timber offered ... shall be adjusted to be comparable with that of independent national forest timber sales, with stumpage rates and profitability criteria comparable to those of independent purchasers in competitive sales." § 301(c)(8).

The policy behind this provision struck at the heart of APC's 50–year agreement. The TTRA specifically required that pricing under APC's contract be placed on a par with pricing for independent loggers operating on short-term agreements. It did so without affecting the obligations APC had assumed under its long-term contract, and which were not required of its short-term competitors. The change had a second effect: it exposed APC to higher prices than those for which it had originally contracted.

Under the original contract, rates had not been fixed for the entire term of the contract. However, both the original contract and the 1990 settlement contract specify the circumstances under which rates can be determined, altered, and redetermined. Contract, §§ 2b-f; Settlement Contract, §§ 2(b)-(e). The contract set actual base prices for each type of timber. This became the pricing floor applied to the timber harvested. However, the Forest Service would also do an appraisal of the value of the timber in a proposed sale area offering. If higher than the base price, APC would pay the appraised price, but no more. This appraisal occurred at the time of the offering, sometimes as many as three years before APC actually harvested in the sale area. By the time the timber was harvested, the market price could be higher or lower than the appraisal. If the market was soft, APC could minimize its logging. But if the market was strong, it could take advantage of that favorable margin.

The Forest Service accomplished the TTRA goal by implementing a comparability price adjustment ("CPA") scheme. The CPA was a formula for determining the market price based on what the independent loggers were paying for their short-term timber purchases. The adjustment was determined by averaging the prices paid by independent loggers during the preceding four quarters. If the CPA or market price was higher than the appraised price, APC's price was adjusted upward. The TTRA change thus required APC to pay *the highest* of the base, appraisal or market prices. Because the CPA was determined subsequent to Forest Service appraisals, the new system allowed the Forest Service to increase retroactively dollar prices APC would pay for timber. But if the market price was lower than the base and appraisal, APC still had to pay *the higher* of those two prices. As a consequence, APC was at risk of paying the higher short-term price when the market was strong. But the Forest Service did not balance this risk by allowing APC to take advantage of a soft market.

Once again, the government's opposition seeks to create a dispute over the actual effect of the unilateral modification. The government has not attempted to minimize the importance of price as an element of the contract, or of APC's expectations, or of the parties' bargain. Instead, Defendant seeks to demonstrate that the comparable price adjustment feature did not significantly affect APC; that APC did not actually bear the burden of any price increase in the intervening years between imposition of the terms in early 1991 and the termination of the contract in early 1994. During that period, APC was able to offset any increase in price with "purchaser credits." Def.App. at 423–24. Furthermore, the government argues that the $5.3 million in price increases claimed by APC for the period "were not material relative to the magnitude of APC's operations." Def. Opp. at 18; *see also,* Def. Resp. to Pl. Suppl. Br. at 6. Defendant also suggests that stumpage rates had not climbed significantly in the wake of the TTRA due to the fact that the adjusted price was ordinarily equivalent to the appraised value. Finally, resorting to the reasoning we earlier found defective, de-

fendant insists that "it is pure speculation whether the CPA would have increased timber prices to APC" since the Forest Service may or may not charge the CPA in any given quarter. Def. Resp. to Pl. Suppl. Br. at 6.

These arguments are legally irrelevant and logically unpersuasive. That APC for a short time offset its increased out-of-pocket costs by available purchaser road credits does not say it would always have those offsets. Nor is $5 million *de minimis* to any but the U.S. Government. And market stability during this three-year period says nothing about differentials between market and appraisal values over the remaining 20 years of the contract.

Most important, the government's arguments once again rest on the discredited theory that the breach was not material because APC did not actually suffer during the 1991–1994 period. *See e.g.,* Def. Opp. at 18 ("Even if the CPA payments had been made in cash, their magnitude would have been insignificant and without material effect.") Equally irrelevant is its assertion that the absence of actual effects during that brief 3-year span "is the best predictor of the likely impact the CPA would have had upon APC's hypothetical performance over the entire 1994–2011 period." *Id.*

Price is material to any sales contract and the government has not argued otherwise. *Cf. Blount, Inc. v. United States,* 22 Cl.Ct. 221, 227 (1990)(in the procurement context price, quality, quantity and delivery all considered material terms of a solicitation); *Firth Constr. Co. v. United States,* 36 Fed.Cl. 268, 272 (1996). When parties negotiate a sales contract, the price agreed upon, or the mechanism for determining the price, is central to the bargain they strike. It is not disputed that section 301(c)(8) altered APC's expectations about how prices would be established. By the same token, the government's implementation of the CPA scheme exposed APC to new and completely different pricing risks to which it had not agreed. The pricing change might or might not have a major financial impact on APC. The government has offered no reason in law or policy why the breaching party should get the benefit of this uncertainty.

In summary, we find the government's breach material in light of what APC and the Forest Service bargained for and agreed to in their contract. *Stone Forest,* 973 F.2d at 1551. Purchasers make long-term commitments to ensure supply of a product and to lock in certain benefits with the hope that over the course of time it will profit from a deal better than that available in a shorter term agreement. Of course, there is no guarantee that APC would fare better than independent short-term contractors. But it was reasonable for APC to expect that its contractual pricing procedures would not change—certainly not while its long-term commitments remained. We need look no further than the stated purpose of this provision: By pricing APC's timber on par with the prices paid by other loggers, section 301(c)(8) negates the advantages of making such a long-term commitment.

### 3. Timber Volume

■ Spruce, hemlock, and cedar provided APC with high quality "sawlogs." The company also harvested lesser quality "utility logs" from these same trees. Utility logs are those with less than one-third of their volume suitable for the production of lumber. They are utilized to produce wood chips and to feed the pulp mill. Even the Forest Service acknowledged that "utility log material is ... different in major respects from what was contemplated in the original contract." *See* Pl.App. at 291 (Correspondence from Director of Timber Management). Accordingly, the Forest Service did not previously include utility logs in the calculation of APC's allowable periodic or total timber volumes. Mr. George Leonard, Associate Chief of the Forest Service, estimated that utility logs accounted for 18–20 percent of a typical harvest based on historical data. The parties do not contest this historical figure; they do disagree on how this figure bears on the issue of materiality.

The TTRA required the modification of APC's contract in order to assure that utility logs were counted against the contract's volume requirements. § 301(c)(6). The statutory provision was carried out by the Secretary of Agriculture and was reflected in the "Unilateral Changes" to the APC contract. *See*

Unilateral Terms at B0.33 ("Utility log volume scaled after February 26, 1991, will be counted as part of Included Timber and against other contract volume requirements in effect after February 26, 1991.") Plaintiff claims that this provision significantly reduced the volume of timber available to APC under the contract.

In order to determine whether the statute's direction was a material change, we must first examine how these logs were treated in the settlement contract. We must then consider the application of the TTRA change to total timber volume, and to periodic timber limits. It is fairly simple to conclude that the effect on periodic harvests was material. As we shall see, however, determining materiality as to total 50–year volume or the remaining 20–year total volume is more problematic.

The original contract provided for the Forest Service to sell APC 5,250,000,000 board feet of timber over the life of the contract, which extended to June 30, 2011. The quantity was subsequently expressed under a different scale as 4,974,700,000 board feet, but for ease in expressing the value, we shall simply refer to the quantity as 5.25 billion board feet. *See* Contract at § 2a ("Timber Included"); Settlement Contract, § 2a. The contract specified periodic 5–year sales of timber with minimum and maximum quantities for each period. The company was to cut between 275 million and 700 million board feet of timber during each 5–year operating period. Contract, § 5c.

The company's "entitlement" was expressed in terms of its commitment to cut, remove and ensure local processing of timber in the sale area. Consequently, the quantity cut in a given period was not fixed, but varied within the minimum and maximum range according to the amount of timber APC was able to harvest in that operating period. Indeed, both the initial contract and the settlement version contain provisions for harvesting additional timber volume in order to maintain specified operating goals. *See* Contract at § 1a(1); Settlement Contract at § 7c(2).

With the imposition of the unilateral terms, APC's periodic harvesting opportunities were reduced by 20 percent. Under the contract's arithmetic, APC had the right to the maximum of 700 million board feet of timber, exclusive of utility logs, in a five-year operating period. For APC to cut that much in net sawlogs alone, its actual gross harvest would have to be 840 million board feet—as much as 140 million board feet greater because utility logs were not counted toward the maximum. Now, with utility logs counted against volume, APC would only be entitled to a net of 560 million board feet of sawlogs in a five-year period to stay within the 700 million total. As applied, then, to APC's periodic entitlements, an 18–20 percent reduction in periodic sawlog harvests constitutes a material reduction, exceeding as it does even the *Stone Forest* benchmark of just under 16 percent. (We shall discuss the *Everett Plywood/Stone Forest* benchmark below.)

The effect on total contract volume—the maximum amount of timber APC could harvest over the 50–year life of the contract—is less certain for at least two reasons. First, it is possible under the contract that shortfalls in periodic harvests might ultimately prevent APC from harvesting its full 5.25 billion board feet 50–year entitlement. Second, the impact of the 20 percent factor on APC's total volume entitlement can be assessed in terms of its 50–year total or in terms of its entitlement over the remaining 20 years of the contract.

We recognize that the quantity actually harvested in any 5–year sale period was a function of cutting thresholds, operating requirements and other variables. Because the contract imposes cutting minimums and maximums for each operating period, APC might not be permitted to make up for past shortfalls. The contract provides for exceeding the permissible maximum in certain circumstances. However, the ability to make up for previous shortfalls was limited by a provision which allowed APC to exceed its 5–year maximum cut only if its cumulative average annual cut had not yet reached 110 million board feet, 1/50th of the total contract volume. Contract, § 5c. Thus, eventually, accumulated shortfalls would necessarily make it mathematically impossible to harvest

the entire 5.25 billion board feet contract total. The parties, however, have not enlightened us as to whether that point had already been reached as of the imposition of the unilateral terms, or when it might be reached in later years. We will, therefore, ignore this mathematical imponderable.

Putting to one side this possible qualification, we can readily see that by including utility logs in total volume, the TTRA potentially altered APC's timber supply for the 21 years remaining under the 50–year contract. Were APC to harvest the maximum over the balance of the contract, at some point the inclusion of utility logs would arguably limit the quantity of the more valuable sawlogs. Plaintiff claims that section 301(c)(6) *reduced* the 50–year contract total by 18–20 percent, a figure arrived at by Mr. Leonard by applying the historical proportion of utility logs harvested to the total harvest volume through 2011.

During oral argument, one necessary modification of this 50–year estimated reduction became apparent. Mr. Leonard had assumed that the utility log provision would apply to the entire 5.25 billion board feet contract total in the time remaining under the contract. Since APC had operated for about 30 years without having to include utility logs in its harvested volume, the TTRA requirement would be effective only for the remaining 20 years, or 40 percent of the life of the contract. Thus, Mr. Leonard's estimate of the effect of the TTRA provision would be something closer to 8 percent of the 50–year contract total.

An evaluation of this percentage alone is misleading because it ignores the magnitude of the quantities involved and the length of time yet to run on the contract. APC and the government had at this time a 20–year contract. If we assess the impact of TTRA provisions on the *remaining* contract entitlement, it looks quite different. Putting aside the shortfall mathematical niceties we discussed previously, we can estimate that APC had 40 percent of its contract term remaining; that is, 40 percent of its 5.25 billion board feet total, or 2.10 billion board feet. A 20 percent reduction in this 20–year contract entitlement is certainly quantitatively signifi-

cant, whether considered in terms of the timber quantity of nearly half billion board feet or its dollar value.

We are not, however, obliged to seek "mathematical exactness," a futile quest in light of all the variables and imponderables in the contract's future. On the contrary, the standard of materiality "is necessarily imprecise and flexible." *Stone Forest,* 973 F.2d at 1551 (citation omitted). As we have earlier stated, we consider the totality of events and circumstances—the overall contract, its stage of performance, and the reasonable expectations of the parties for the remainder of the life of the contract. *Id.* at 1552. With those considerations in mind, our task is to determine whether, as a matter of law, APC was deprived of the benefit for which it bargained. REST. 2D at § 241.

Two cases have discussed the matter of materiality when the effect can be quantified, *Stone Forest* and *Everett Plywood.* The factual circumstances in *Stone Forest* closely resemble those here. There the contractor agreed to purchase, cut, and remove a certain volume of timber from designated areas. Intervening legislation caused the Forest Service to deny access to some of those areas. In evaluating the materiality of this breach, the Court of Appeals for the Federal Circuit recognized that only half the term of the contract had run, and that denial of 15.89 percent of the total volume of timber for which Stone Forest contracted constituted a material breach. *Stone Forest,* 973 F.2d at 1552. On the other hand, in *Everett Plywood,* where over 93 percent of the contract timber had already been logged, denial of the remaining 6–plus percent timber was not a material breach. 512 F.2d at 1093–94.

The government would have us consider that section 301(c)(6) did not actually alter the total volume of timber sold to APC in the 1990–1993 period following implementation of the unilateral modifications. It also stresses that APC typically did not approach the maximum allowable limits in its previous harvests. In doing so, the government once again would have us examine post-breach eventualities, a variation of *Marathon* explicitly rejected by *Mobil.* 530 U.S. 604, 120 S.Ct. at 2437. *Stone Forest* requires us to

consider the magnitude of the breach in light of the remaining contract term, but that exercise does not and could not impair *Mobil's* teaching. *See Stone Forest,* 973 F.2d at 1552 (breach is "less likely to be regarded as material if it occurs late, after substantial ... performance, and more likely to be regarded as material if it occurs early ...")(quoting REST. 2D, § 241 cmt. d). Quite simply, for 40 percent of the contract term—20 years—APC's harvest would be reduced by 20 percent, a material reduction.

Finally, defendant asserts that it informed APC in the wake of TTRA that the Forest Service was not precluded from providing additional volume to make up for any shortfalls in sawlog volume attributable to the new utility log terms. But APC did not bargain for the government's beneficence, and the company need not trade contractual rights for the hope that the government will exercise its discretion its favor.

### Waiver and Election of Remedies

■ Defendant argues that APC has waived repudiation as a basis of liability. Acceptance of a once-repudiated contract can constitute waiver. *Mobil,* 530 U.S. 604, 120 S.Ct. at 2436. But one does not waive a claim for repudiation simply by urging the breaching party to perform in spite of the repudiation. *Id.* (citing REST. 2D at § 257). We look to a number of factors in determining the question of waiver. *See generally, Cities Service Helex, Inc. v. United States,* 211 Ct.Cl. 222, 543 F.2d 1306, 1313–15 (1976)(surveying various formulations of election of remedies doctrine). We determine whether APC explicitly reserved its claims and justified its choice to continue in spite of the repudiation. *Cities Serv.,* 543 F.2d at 1316 (citing *Northern Helex Co. v. United States,* 197 Ct.Cl. 118, 455 F.2d 546 (1972)). We also consider whether APC received the consideration for which it bargained. *Mobil,* 530 U.S. 604, 120 S.Ct. at 2436–37. Finally, we may consider the extent to which the repudiating party relied to its detriment on the promisee's acceptance of the repudiation. *Dow Chemical Co. v. United States,* 226 F.3d 1334, 1346 (Fed.Cir.2000); *Ling–Temco–Vought, Inc. v. United States,* 201 Ct.Cl. 135, 146–47, 475 F.2d 630, 635–38 (1973).

■ We reject this waiver argument for two independent reasons: First, the defendant has repeatedly failed to comply with explicit procedural orders and requirements in connection with this issue. Unfortunately, this pattern of disregard is nothing new for the government during the litigation of this case. We are also unpersuaded of the merits of its argument.

When litigating summary judgment motions, the Court's Rules require that each party submit a separate filing designating those facts upon which it relies and which it believes are undisputed, citing to the record. RCFC 56(d) The other party then may admit the assertion is indeed undisputed, or may proffer evidence that it contends puts the factual assertion into issue. At the same time, it may submit its own collection of proposed undisputed facts. This Court's Special Procedures Order issued to the parties on September 29, 1999, combines these separate submissions into one document filed jointly by the parties—a Consolidated Statement of Uncontroverted Facts ("CSUF"). Regardless of form, the process is essential because it alerts each party and the Court to the facts upon which each party's legal argument relies. A party may not hide the ball by asserting or alluding in its papers or argument to the existence of facts which are not proffered pursuant to the Rule 56 process.

The government, however, did exactly that in its briefs on the waiver issue. It made two cursory factual references, citing 22 pages of the appendix for support. In two other instances defendant cited generally to other litigation. The relevance of the record materials for the factual assertions is not apparent. Moreover, the government did not include in the CSUF any factual assertions which related to its waiver argument. Thus, APC was denied the Rule 56 opportunity to review those factual references and determine whether it would dispute them.

During oral argument, the Court admonished the government on this important procedural defect. We directed the government to identify during its argument each specific fact upon which its waiver theory relied, then

to prepare a supplemental CSUF with those facts and supporting record references, and to present it to APC for its review prior to filing with the Court. In this manner the government was given the opportunity to remedy its procedural failure after the fact. But the defendant chose to ignore this expedient, as well. Counsel did not identify any specific facts during its waiver argument, and the government did not submit any supplemental CSUF. Thus, the Court is left in the dark as to the facts upon which the government relies in making this argument. Perhaps nothing demonstrates this remarkable reluctance to offer factual support for its argument better than the following footnote at the very end of defendant's waiver discussion in its Supplemental Brief, filed October 3, 2000:

> The government has additional factual arguments which have been developed after considering all of the discovery obtained following our July 9, 1999, opposition brief *and will provide them to the Court upon request.*

Def. Resp. to Pl. Suppl Br. at 10, n. 1 (emphasis added). The Court did more than "request" factual support; it ordered the government to supply it. The government chose to ignore the Court.

The government's waiver arguments are no more satisfactory when considered on their merits. Ignoring its own procedural failures, the government initially set forth what appears to be a hyper-technical semantic argument. Without citation to authority, defendant asserts that APC is barred from claiming repudiation due to its failure to invoke formally the term "repudiation" when it objected to the TTRA. This position does not comport with our liberal rules of pleading, which simply require a short and plain statement of the claim showing plaintiff is entitled to relief. RCFC 8(a)(2). It is these very principles that persuade us to overlook defendant's own failure to abide by Rule 8(c) in pleading the affirmative defense of waiver. *See* ORDER (Oct. 10, 2000)("If necessary, the government and APC will have ample opportunity to amend their pleadings to conform to the evidence."); *see also,* RCFC 8(f)("All pleadings shall be construed as to do

substantial justice.") We allow legal theories arising from the same set of "operative facts" as those pled. *Cerberonics, Inc. v. United States,* 13 Cl.Ct. 415, 417–18 (1987).

Plaintiff adequately preserved its repudiation theory in its dealings with the contracting officer and Forest Service representatives. Though APC may not have specifically used the magic word "repudiation"—we will assume this for purposes of discussion—APC established repudiation facts and plainly characterized the imposition of the unilateral terms as a material breach excusing further performance on its part. The government was certainly on notice of APC's opposition to the TTRA changes. Those objections are sufficient to raise the closely related theory of repudiation.

In its supplemental responsive pleading, to which we just referred, the government waiver defense evolved to a substantive theory. In a section that barely covers 10 lines, it perfunctorily asserts three factual bases upon which to support waiver: (1) "APC continued to accept and pay for timber from the [Forest Service]," (citing 20 pages from the appendix); (2) APC proposed to replace its closed pulp mill with another facility, indicating its intent to continue performance, (citing three appendix pages), and (3) in reliance on APC's continued performance, the government prepared Environmental Impact Statements ("EIS") pursuant to the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) (citing that statute and a page in a reported case).

It is impossible to divine the relevance of the record references cited in support of the first two propositions. As respects the first, the references consist of three APC memoranda entitled "Wood Cost Statement" for March of 1993, 1994 and 1995, respectively. These memoranda contain extremely detailed cost, income, and production figures in numerous charts, as well as operational statements. Similarly, the three cited references for the pulp mill assertion consist of the last page of a four-page memorandum of an item-by-item commentary on a "draft NPDES Permit," not otherwise identified; a 1990 APC memorandum urging department heads

to economize in the face of a soft market for pulp wood; and a 1992 memorandum to the president of APC entitled "Critical Sales Situation." As to the last assertion, having to do with the EIS, the government cites only the National Environmental Protection Act and a page in a reported case. As factual support for a claim of detrimental reliance, this is totally inadequate.

In its initial opposition brief, the government asserted that APC had waived its claim, in part "by continuing to perform under the contract and endeavoring to mitigate the relatively minor, if any, effect of the TTRA, through negotiations with the Forest Service." Def. Opp. at 4. There is no dispute that APC continued to harvest timber, and that it closed the pulp mill in July 1993 and later sought the Forest Service's views on a substitute facility. But these actions do not demonstrate that APC accepted the unilateral changes of the TTRA under any formulation of the waiver doctrine. Rather, APC's unrelenting attempts to lobby—negotiate—for relief from the TTRA, as revealed in the record available to us, lead to the opposite conclusion.

After enactment but prior to the Forest Service's implementation, APC was asked to provide suggested contract changes for the Secretary of Agriculture's consideration. APC proposed changes that would minimize the legislation's impact on its contract. But even as it did so, it advised the government of its basic legal position. As these suggestions were forwarded through the appropriate officials, the following disclaimer appeared again and again:

> By supplying these suggestions, Alaska Pulp Corporation makes or intends no representation or implication that it would concur in the revisions if they are adopted or would waive any claim Alaska Pulp Corporation may have against the United States as a consequence of enactment and application to Alaska Pulp Corporation of the Tongass Timber Reform Act.

Pl.App. at 410–414A.

Following the Forest Service's implementation of the unilateral terms on February 28, 1991, APC continued its effort to convince the Forest Service that it "imposed far more

economically onerous terms than were required by the TTRA." Def.App. at 316; *see also,* Pl.App. at 341–42 ("Currently, we are preparing to approach the Forest service to ask its leadership to reevaluate several recent decisions and to adhere more closely to the original provisions of the 50–year contract.")

As the government concedes, APC continued to negotiate with the Forest Service while attempting to mitigate the TTRA effects. Def. Opp. at 4. In fact, a full two years after passage of the TTRA, APC officials were meeting with Forest Service officials to address the TTRA's effect on comparability prices, utility logs and the mid-market test. In correspondence addressed to Mr. George Ishiyama, President of APC, dated December 18, 1992, Mr. George Woodbury of APC writes in part:

> Mid market is the issue in which changes can be made that would be of benefit to APC and the Forest service has the latitude to make the changes. If the mid market test is changed back to the way it was negotiated in the July 1990 contract the economic timber issue will be taken care of and perhaps the utility problem would be temporarily fixed.

> George Leonard [Regional Forester] promised that we would have an answer on the above within two weeks. With this answer and the 1993 Budget we should have the information necessary to make a decision on the law suit.

Def.App. at 424. The contents of this memorandum make it clear that APC was negotiating to moderate the impact of TTRA. Other exhibits in the papers filed by the parties indicate that APC was just as active in pursuing political channels to influence the Forest Service. *See e.g.,* Correspondence from Senator Murkowski to Mr. Woodbury of APC, dated March 5, 1991 ("I told George [George Leonard, Assoc. Chief, U.S. Forest Service] in no uncertain terms that a commitment to me, by him, had been made to provide that mill with an adequate wood supply and I was prepared to camp on their doorstep until hell froze over if that were not the case.") at Pl.App. at 230–31.

Finally, six months later, when it halted pulp mill operations, APC again made it clear that the TTRA terms were in breach of the contract. Far from waiving the repudiation as a legal matter, if anything APC was apparently using its pulp mill closure as a bargaining chit to gain concessions on its primary manufacturing responsibilities. Def. App. 315–25.

Waiver has been found when the injured party remains silent in response to a breach, thereby misleading the other party as to intentions, inducing detrimental reliance. See *Ling–Temco–Vought*, 475 F.2d at 636–38 (in continuing to perform and failing to object or reserve its rights, plaintiff prevented government's ability to evaluate its position and choose from among its options, thereby causing significant federal expenditures). We also recognize that often a contractor purposefully and tactically declines to mention a breach, and thereby waives its claim. *Becho, Inc. v. United States*, 47 Fed.Cl. 595, 604–05 (2000). But these are not the circumstances here. Every step of the way, APC registered its objection to the unilateral terms. The company endeavored to negotiate a settlement that would preserve its long-term relationship, while making clear to the government that it objected to the TTRA unilateral charges. We should not apply the waiver doctrine so as to compound the injury of the non-breaching party by precluding its efforts to preserve the contractual relationship on a compromised basis. The government's approach would force the non-breaching party to choose between swallowing the TTRA changes or abandoning the contract entirely, a Thomas Hobson's choice that would reward the breaching party and add further injury to APC.

In arguing for waiver based on estoppel, the government offers a partial quote from a Federal Circuit case, *Dow Chemical Co. v. United States*, 226 F.3d 1334, 1346 (Fed.Cir. 2000), and denotes its selection as a holding. *See* Def. Resp. to Pl. Supp. Br. at 9. First, read in its entirety, the reference is not a "holding," as defendant suggests. In fact, the quoted language is not even that of the Court of Appeals. It is simply the Court's recitation of Professor's Corbin's view on election of remedies in the *Cities Serv. Helex* case. 543 F.2d at 1314. Moreover, on its facts *Dow Chemical* actually favors the plaintiff's position here. The Court of Appeals was not persuaded *that a 6–year delay* waived the contractor's right to terminate a repudiated licensing agreement. *Dow Chemical*, 226 F.3d at 1346. Specifically, the Court relied upon the absence of evidence that the government was prejudiced by the delay. *Id.*

There is no cause to view the government as a victim here, no reason to find that the Forest Service "changed [its] position in reliance on [APC's] failure to cancel" the contract, no prejudice to the government during this period. *Dow Chemical*, 226 F.3d at 1346 (quoting *Cities Serv.*, 543 F.2d at 1314). Given the history of litigation that resulted in the settlement contract, it would be unreasonable to assume that APC would relent in its legal challenges when the fruit of the settlement, the mid-market test, was stripped away. The truth is that the mid-market test, the pricing formulation and the volume provisions of the original and settlement versions of the contract were examined by both parties for ways to mitigate the effect of the TTRA.

Overall, the evidence shows that the government was well aware that APC still contemplated the option of a legal claim for repudiation. Under the circumstances, therefore, had there been any detrimental reliance by the government, it would have been unjustified. Plaintiff's post-TTRA actions reflected a multifaceted strategy. But APC consistently maintained that the TTRA changes constituted a material breach of its long-term contract, and the option of legal action remained.

### CONCLUSION

As one of its proposed undisputed facts, the government asserted the following:

The settlement contract was no longer effective after enactment and implementation of the Tongass Timber Reform Act (TTRA). Congress passed the TTRA November 28, 1990 and it was implemented February 27, 1991. Public Law No. 101–626 (November 28, 1990), PA 165 (Tab D);

Timber Sale Contract No. 12–11–010–1545 ("the Unilateral terms"), PA 89 (Tab C). CSUF. No. 7. As one can readily see, this is not a "fact" at all, but a proposed conclusion as to the legal effect of the TTRA on the settlement contract. Whatever else one might say, this is a formulation of a classic repudiation, and represents the government's concession. Whatever "agreement" APC was left with after the unilateral terms were imposed, it was not the same as the bargain struck "[f]or and in consideration of the promises and agreements . . . contained" within the four corners of the original contract. *See* Contract (General Terms).

This Court on a prior occasion held that the Forest Service may not unilaterally alter volume, price or quality terms of a timber contract. *Croman Corp. v. United States,* 31 Fed.Cl. 741, 746–48 (1994). Yet here the Forest Service modified the APC contract with respect to all three of those terms. Absent some affirmative defense, such as waiver, which we reject, defendant's only recourse was to demonstrate that these admittedly non-consensual modifications—the "unilateral terms"—do not amount to a total or material breach. To this end, the government simply offered unadorned denials.

Under *Stone Forest,* a case which defendant cites as support, we would be in error were we to "measure each contributing element separately and, finding it small, remove it from the equation." *Stone Forest,* 973 F.2d at 1552. But that is precisely what defendant urges us to do. The government's position is typified by the argument that a $5 million price increase here, or reduction of one-half billion board feet of timber there, is immaterial. Plaintiff, on the other hand, has shown that individually and collectively these provisions have resulted in an entirely different agreement from the one it entered into 30 years earlier, or modified in 1990. It is this showing, and not the actual impact, financial or otherwise, which is central.

Simply put, the loss of contractual guarantees respecting the quantity, quality and pricing of Alaska timber substantially impairs the value of the contract to APC. *Mobil,* 530 U.S. 604, 120 S.Ct. at 2432; REST. 2D at § 243(4). We have no trouble finding

that the unilateral terms imposed by the statute each, and certainly collectively, constituted a total breach.

For the reasons stated above, we hold that the United States repudiated its contract with plaintiff when it enacted sections 301(c)(6), 301(c)(8) and 301(c)(9) of the TTRA. Additionally, the United States materially breached the contract when it imposed the unilateral terms. Plaintiff is entitled to judgment as a matter of law with respect to liability for defendant's breach. Accordingly, APC's partial motion for summary judgment is hereby GRANTED.

**IT IS SO ORDERED.**